IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER AFFIRMING AGENCY DECISION**<br><br><br>Case No. 2:07-cv-00837 CW<br><br>Judge Clark Waddoups |

## <u>INTRODUCTION</u>

In this action, Plaintiffs[1] challenge two permits issued by the United States Fish and Wildlife Service (the "Service") under the Endangered Species Act ("ESA"). The permits authorize Cedar City, Utah and the Paiute Indian Tribe to live trap and relocate Utah Prairie Dogs that are damaging the Cedar City municipal golf course and adjacent lands owned by the Paiute Tribe. The Utah Prairie Dog is a "threatened"[2] species under the ESA. It is unlawful to "take" members of this species due to its status. "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."[3] "Harm" includes "significant habitat modification or degradation where it

---

[1] Plaintiffs include WildEarth Guardians, Utah Environmental Congress, Center for Native Ecosystems, and Terry Tempest Williams (collectively "WildEarth Guardians").

[2] Initially, the Utah Prairie Dog was listed as an endangered species. After its population increased, its status was changed to "threatened."

[3] 16 U.S.C. § 1532(19) (2006).

actually kills or injures wildlife by significantly impairing . . . feeding or sheltering." [4]  Despite these provisions, if a take is incidental to an otherwise lawful activity, one can obtain a permit to take a protected species under certain conditions.[5]

This matter is before the court to review the administrative action of the Service.  WildEarth Guardians seeks revocation of the permits on the basis that (1) the Service failed to include a numeric take limit on the permits themselves, and (2) the Service's actions were arbitrary and capricious when it found that the Habitat Conservation Plan ("HCP") sufficiently minimizes and mitigates the take's impact.  After due consideration of the memoranda, administrative record, other documents, oral argument, and the facts and law relevant to this matter, the court rejects the challenge and upholds the administrative action.

## FACTUAL BACKGROUND

### Utah Prairie Dog Background Information

WildEarth Guardians seeks to stop the take of Utah Prairie Dogs at the Cedar Ridge Golf Course (the "Golf Course") and Paiute lands under two permits that were issued in January 2007.  Utah Prairie Dogs are on the endangered species list as an animal that is "threatened"[6] with extinction.  In 1991, the Service formulated a Recovery Plan to help increase the Utah Prairie Dog population.  One goal of the plan is to establish and maintain prairie dog colonies on specified public

---

[4]  50 C.F.R. § 17.3 (2009).

[5]  16 U.S.C. § 1539(a)(1)(B) (2006).

[6]  The danger of extinction is less for a "threatened" species than an "endangered" species.

land sites.[7]   Another goal is to transfer animals between populations on these sites for genetic mixing.[8]   Genetic diversity is thought to help increase the species' likelihood of survival.   To accomplish these goals, the Service determined that it needed to conduct a translocation program.[9]

In 1994, an interdisciplinary team developed procedures to translocate prairie dogs from private lands to public lands.  These procedures were updated in 2006, and continue to be reviewed by the interdisciplinary team.[10]  Unfortunately, when Utah Prairie Dogs have been relocated from private land to public land, historically only about ten percent have survived.[11]   Through the translocation program, however,  the number of "prairie dog colonies on public land has increased" over the years.[12]

Each spring, before the young prairie dogs have emerged, the Service "surveys all known colonies to estimate the number of adult[]" prairie dogs.[13]  The survey "numbers do not represent a true census but indicate trends in population numbers."[14]  This is "because only 40 to 60 percent  of

_____

[7]  Administrative Record ("AR"), at 1177 (filed conventionally on April 15, 2008 and May 1, 2008.)

[8]  Id.

[9]  Id.

[10]  AR 532–50; see also AR 673, ¶ G.

[11]  AR 656.  "Survival is based on retention of animals to the translocation site the following year.  Some animals within the 90% considered lost may in fact have survived but disbursed to a site that is not monitored."  Id.

[12]  AR 653.

[13]  Id.

[14]  Id.

individual prairie dogs are above ground at any one time."[15]  Additionally, the prairie dog population can fluctuate significantly from year to year due to climate and disease factors.[16]  In particular, Utah Prairie Dogs "are highly susceptible to sylvatic plague," which can cause a crash of an entire colony.[17]

**The Habitat Conservation Plans**

Iron County, Utah has an HCP, which allows the permanent or non-permanent take of a certain number of Utah Prairie Dogs per year.  The Golf Course was permitted to use the non-permanent take provisions of the Iron County HCP in an attempt to control the prairie dog population on the Golf Course.[18]  Nevertheless, the Golf Course has continued to suffer damage from prairie dogs.[19] Likewise, the Paiute lands have also suffered damage from burrows.  Because both areas "are heavily utilized for recreational purposes," Cedar City and the Paiute Tribe determined they needed their own HCP to "minimize or negate" the "adverse human/prairie dog interaction."[20]  "Cedar City submitted the first draft of the HCP" on July 8, 2003.[21]

The Service reviewed the HCP proposed by Cedar City and the Paiute Tribe and evaluated the Utah Prairie Dog population on these lands.  The Golf Course colony is unnaturally large due to

---

[15] Id.

[16] See AR 654.

[17] Id.

[18] AR 509.

[19] See AR 507.

[20] Id.

[21] AR 651.

artificial conditions, such as an "unlimited food supply and lack of predators."[22]   Because of development around the Golf Course, the colony is "fragmented and becoming more isolated."[23]   The colony therefore does not contribute to genetic mixing of the species.   Because the Golf Course colony lives in an artificial environment and does not contribute to survival of the overall species, the Service determined that the proposed HCP was "not likely to jeopardize the continued existence of the Utah Prairie Dog, and is not likely to destroy or adversely modify designated critical habitat."[24]

In making this determination, the Service considered the mitigation factors proposed by the applicants.   It particular, Iron County purchased "a 303 acre parcel of land surrounded by BLM lands."[25]   It then agreed, upon issuance of the permits, to put this land into a conservation easement for purposes of preserving a permanent prairie dog habitat.[26]   The land is known as Wild Pea Hollow and it is adjacent to other public lands that support a prairie dog colony.[27]   This land provides the potential for genetic mixing between colonies.[28]   Consequently, the Service found that "[p]rotection of this land will minimize fragmentation in the future of the West Desert Recovery Area and provide good habitat for expansion and dispersal of adjacent colonies."[29]

---

[22]   AR 654.

[23]   AR 655.

[24]   AR 656.

[25]   AR 651.

[26]   AR 515, 551.

[27]   AR 656.

[28]   Id.

[29]   Id.

Wild Pea Hollow currently has approximately 19 acres that are inhabited by prairie dogs.[30] About 198 additional acres at Wild Pea Hollow are amenable to a prairie dog habitat, but the area needs revegetation before the habitat can be expanded.  As part of the approval process, Cedar City and other governmental agencies agreed to revegetate the area, and the reseeding began in 2004.[31] As an additional safeguard, the Paiute Tribe cannot start removing prairie dogs from its land until the revegetation has been successful at Wild Pea Hollow or the adult population on that site reaches at least seventy for two consecutive years.[32]  At the time the permits were issued, the estimated loss of prairie dog habitat on the Golf Course and Paiute lands was "18 acres of occupied habitat."[33]  The Service found that the permanent preservation and revegetation of Wild Pea Hollow has adequately minimized and mitigated the loss of the Golf Course and Paiute land habitats.[34]  It also furthered the goal of translocating prairie dogs to public lands and promoting a viable habitat on such lands.[35]

Based on these measures, Cedar City and the Paiute Tribe have been granted a twenty-year

---

[30]  Id.

[31]  AR 300.  In addition, Cedar City, the Paiute Tribe, Iron County, the Service, the United States Bureau of Land Management, and the Utah Division of Wildlife Resources entered into an Implementation Agreement to provide further assurance that the parties will meet their individual obligations under the HCP and conservation easement.  See AR 580–91.

[32]  AR 513, 517.  In 2005, survey information indicated that the prairie dog population at Wild Pea Hollow was 57 and had been steadily increasing since 1998.  AR 436.  After the permits were issued, the colony crashed likely due to the plague.  The Service is monitoring the site, and if necessary, it will spray for fleas and translocate prairie dogs to the site to re-establish a colony.

[33]  AR 655.  The Golf Course contained about 13.5 acres of occupied habitat and the Paiute lands contained about 4.5 acres of occupied habitat.  Id.

[34]  AR 656.

[35]  Id.

incidental take permit that allows them to remove Utah Prairie Dogs from the specified lands permanently[36] and translocate them to an approved recovery site.[37]  The goal of the permits is to have the Golf Course and Paiute lands free of Utah Prairie Dogs.[38]

**Administrative Approval Process**

Before the Service granted Cedar City a permit, it reviewed and commented on various draft HCP's that the City submitted.  The Service also "conducted several meetings" with the applicants and corresponded with them "to discuss and clarify details of the HCP."[39]  On May 15, 2006, the Service published a "[n]otice of availability and receipt of application" in the *Federal Register*.[40] In that notice, the Service announced that Cedar City and the Paiute Tribe had applied for an incidental take permit to allow the taking of Utah Prairie Dogs.[41]  It informed the public about "the availability of a draft Environmental Assessment (EA) and a draft Habitat Conservation Plan (HCP) for public review and comment."[42]  The Service also requested "comments from the public on the permit application, EA, and HCP," and allowed until July 14, 2006 for such comments to be submitted.[43]

---

[36]  A "permanent" take allows Cedar City and the Paiute Tribe to fill in burrow holes after Utah Prairie Dogs are trapped and removed from the site.  Under a non-permanent take, the holes cannot be filled in.

[37]  AR 651, 675.

[38]  AR 651.

[39]  Id.

[40]  71 Fed Reg. 28048 (May 15, 2006), at AR 592.

[41]  AR 592.

[42]  Id.

[43]  Id.

In response, the Service received three letters.  One letter was from Forest Guardians, the predecessor of WildEarth Guardians.[44]  Forest Guardians also submitted a second letter stating that Wildlands Conservation Alliance and an individual supported the comments that Forest Guardians had submitted.[45]  The two letters will therefore be treated as one for purposes of analysis.[46]  In its letter, WildEarth objected to the lethal control of the prairie dogs and noted serious concerns about the translocation survival rate.[47]  It encouraged the Service to try using buried fences at the Golf Course or other alternatives before attempting translocation.[48]  WildEarth also expressed other concerns, including its concern that Wild Pea Hollow provided inadequate mitigation.[49]

In reply, the Service agreed that lethal trapping was impermissible and removed that from the HCP.[50]  It issued a Finding of No Significant Impact and a response to the public comments, which addressed the other issues raised by WildEarth Guardians.[51]  Ultimately, however, the Service concluded the HCP was appropriate, and it issued two permits on January 5, 2007.[52]  This date was

---

[44]  AR 602.

[45]  AR 617.

[46]  The third letter was from the Bureau of Indian Affairs ("BIA"), which informed the Service that the BIA did "not object to the proposed action."  AR 600.

[47]  AR 603–05.

[48]  AR 609.

[49]  AR 605–07.

[50]  AR 665.

[51]  See AR 1397–1407 (Docket No. 31); see also AR 664.

[52]  See AR 669–74.

more than three years after the Service received the first draft of the HCP.[53]

**Estimated Take**

       Under the Biological Opinion and the Incidental Take Statement, the Service estimated the total take on these lands would be about 604 prairie dogs during the first two years, with a habitat loss of 13.5 acres on the Golf Course and 4.5 acres on the tribal land.[54]  The estimate "was based on five year average annual counts of adult prairie dogs located on the lands covered by the HCP."[55] Cedar City began removing prairie dogs from the Golf Course in summer of 2007 to Berry Springs, which is an approved recovery site.  Despite removing 508 prairie dogs in 2007, the following year, Cedar City still counted 408 adult prairie dogs on the Golf Course.[56]  It therefore became evident the take would need to be greater than originally anticipated.

       As a result, the Service reevaluated the impact on the species and concluded that up to 800 prairie dogs would need to be removed per year for the Golf Course and Paiute Lands to be free of prairie dogs.[57]  On August 1, 2008, the Service issued a new Biological Opinion that concluded the increased take would not jeopardize the continued existence of the species.[58]  In making this determination, the Service evaluated scientific data and the new declarations and material provided

---

[53]  See AR 651.

[54]  AR 655, 657, 663; Reinitiation of Intra-Service Consultation, at 11 (Aug. 1, 2008) (Docket No. 55, Ex. 1).

[55]  Reinitiation of Intra-Service Consultation, at 1 (Aug. 1, 2008) (Docket No. 55, Ex. 1).

[56]  Id. at 8.

[57]  Id. at 13–14.

[58]  Id. at 12–13.

by WildEarth Guardians during this lawsuit.  WildEarth Guardians has not challenged the new opinion.

## MOOT CLAIMS and REMAINING ISSUES

On October 17, 2008, WildEarth Guardians filed its opening brief.  Although its Amended Complaint contains eight causes of action, WildEarth Guardians' opening brief only pertains to three of the claims.  Having not addressed the other five claims in its brief, WildEarth Guardians agrees that claims 3, 4, 6, 7, and 8 should be dismissed.[59]  WildEarth Guardians contends, however, that the claims should be dismissed without prejudice because the court has no authority to reach the merits of claims that are moot. While it is true the court cannot address claims that are moot, this does not preclude them from being dismissed with prejudice.[60]   Accordingly, claims 3, 4, 6, 7, and 8 are hereby dismissed with prejudice.

The remaining issues addressed in WildEarth Guardians's brief are (1) "whether the Service violated the ESA by not including a 'numeric take limit' on the incidental take permits; and (2) whether the Service's . . . finding that the HCP sufficiently minimizes and mitigates the impact of the take is arbitrary and irrational."[61]

---

[59]  Plaintiff's Reply Brief on the Merits, at 3 (Docket No. 72).

[60]  See King v. Nevada Elec. Inv. Co., 893 F. Supp. 1006, 1009 (D. Utah 1994) (dismissing with prejudice third-party complaint because it was rendered moot).

[61]  Defendant's Opposition Brief on the Merits, at 2 (Docket No. 67).

## ANALYSIS

### I.    STANDARD OF REVIEW

The Administrative Procedure Act ("ACT") "governs judicial review of agency actions."[62]

A court's review is limited to determining whether the Service's actions were "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law."[63]   Such a "review is highly

deferential," and "[a] presumption of validity attaches to the agency action."[64]   Nevertheless, the

court has a duty "to ascertain whether the agency examined the relevant data and articulated a

rational connection between the facts found and the decision made."[65]   In its review, the "court must

determine . . . whether there has been a clear error of judgment."[66]   This review, however, is limited

to the full administrative record that was before the Service at the time it made its decision.[67]

---

[62]   Citizens' Comm. to Save Our Canyons v. Krueger, 513 F.3d 1169, 1176 (10th Cir. 2008) (citations omitted).

[63]   5 U.S.C. § 706(2)(A) (2006); Biodiversity Legal Found. v. Babbitt, 146 F.3d 1249, 1252 (10th Cir. 1998) (quotations and citations omitted).   An agency decision is arbitrary and capricious if

> the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Colorado Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999) (alteration in original) (quotations and citations omitted).

[64]   Citizens' Comm. to Save Our Canyons, 513 F.3d at 1176.

[65]   Id. (quotations and citations omitted).

[66]   Id. (quotations and citations omitted).

[67]   Lewis v. Babbitt, 998 F.2d 880, 882 (10th Cir. 1993) (citation omitted).

## II.     APPLICABLE LAW

To obtain an incidental take permit, Section 10 of the ESA requires an applicant to submit

an HCP to the Service that addresses the following four elements:

> (i) the impact which will likely result from such taking;
>
> (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;
>
> (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and
>
> (iv) such other measures that the [Service] may require as being necessary or appropriate for purposes of the plan.[68]

Once an applicant has submitted an HCP that addresses these elements, the Service reviews

the HCP to determine whether

> (i) the taking will be incidental;
>
> (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;
>
> (iii) the applicant will ensure that adequate funding for the plan will be provided; [and]
>
> (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild.[69]

In addition, if the HCP includes other measures that are necessary or appropriate for purposes of the

plan, the Service evaluates whether the HCP will meet those measures.[70]  If further assurances are

---

[68]  16 U.S.C. § 1539(a)(2)(A)(i)–(iv).

[69]  Id. § 1539(a)(2)(B)(i)–(iv).

[70]  Id. § 1539(a)(2)(B)(v).

needed to ensure "that the plan will be implemented," the Service may require them.[71]  Notably, the public also has an opportunity to comment on the application and HCP during the application process.[72]

Besides these provisions, Section 7 of the ESA requires other federal agencies to consult with the Service to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." [73]  Because the Service is both the action agency and the consulting agency in this case, however, the Service conducted an intra-agency consultation.

As part of the consultation, the Service prepares a Biological Opinion that addresses whether a proposed take "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."[74]  To "jeopardize the continued existence of" means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species *in the wild* by reducing the reproduction, numbers, or distribution of that species."[75]  Thus, the "no jeopardy" requirement is similar to the Section 10 finding that a take will not appreciably reduce the likelihood of the survival and recovery of the species in the wild.

---

[71]  Id. § 1539(a)(2)(B).

[72]  See id. § 1539(a)(2)(B); 50 C.F.R. § 17.32(b)(1)(ii)–(iii) (2009).

[73]  16 U.S.C. § 1536(a)(2) (2009).

[74]  50 C.F.R. § 402.14(g)(4) (2009).

[75]  Id. § 402.02 (defining "jeopardize the continued existence of") (emphasis added).

If the Service issues a "no jeopardy" Biological Opinion, it must include an incidental take statement in the opinion that "(i) Specifies the impact, i.e., the amount or extent, of such incidental taking on the species;" and "(ii) Specifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact."[76]  "If during the course of the action the amount or extent of incidental taking . . . is exceeded, the [Service] must reinitiate consultation immediately" to determine if jeopardy exists.[77]  When the additional take will jeopardize the species and other options are not available to avert this risk, the Service may revoke the permit.[78]  Likewise, the Service retains the power to revoke the permit if the Service "finds that the permittee is not complying with the terms and conditions of the permit."[79]

## III.   NUMERIC TAKE

WildEarth Guardians asserts the take permits must be vacated because the Service failed to include a take limit on the permits.  To support its contention, WildEarth Guardians cites to Section 7 of the ESA.  As stated above, when the Service issues a "no jeopardy" Biological Opinion, the opinion must include an incidental take statement that specifies the amount or extent of the take.  An incidental take statement under Section 7 of the ESA is different from an incidental take permit under Section 10.  Thus, WildEarth Guardians' citation to Section 7 requirements does not support that an incidental take permit must include the specific numeric take amount.  Moreover, the Service

---

[76]  Id. § 402.14(i)(1)(i)–(ii).

[77]  Id. § 402.14(i)(4).

[78]  Id. § 17.32(b)(5)(iii)(C)(8).

[79]  16 U.S.C. § 1539(a)(2)(C).

did specify the amount of the take in its incidental take statement—about 604 prairie dogs during the first two years.  The Service, therefore, complied with its statutory requirement to include a take amount in the incidental take statement.

WildEarth Guardians next cites to comments made by the Service in the *Federal Register* regarding an addendum to the *Handbook for Habitat Conservation Planning and Incidental Take Permitting Process* ("HCP Handbook").  In the comment section, the Service stated that it "will follow the guidance in the HCP Handbook including this addendum."[80]  It also made a comment that the incidental take must be quantified "on the permit itself."[81]  Finally, the Service stated it "should ensure that the incidental take of the covered species does not exceed the level authorized under the incidental take permit."[82]  Based on these comments, WildEarth Guardians contends the Service is legally bound to specify the take limit in the permit.

"An agency manual, in contrast to a regulation, is not necessarily entitled to the force and effect of law."[83]  "This is particularly true if the agency did not intend the manual to be mandatory, but rather intended it as a guidance or advisory document."[84]  In *Aragon*, a U.S. Air Force manual stated it was "intended for guidance" due to "the varied nature of industrial problems."[85]  The Tenth

---

[80]  65 FR 35243, Response 1 (June 1, 2000) (Docket No. 72, Ex. 1).

[81]  Id. at 35245, Response 11.

[82]  Id. at 35254.

[83]  Aragon v. United States, 146 F.3d 819, 824 (10th Cir. 1998) (citation omitted).

[84]  Id. (citation omitted).

[85]  Id. at 824–25.

Circuit Court of Appeals found that "express qualification weighs heavily against ruling the Manual prescribed mandatory directives."[86]

In this case, the Service made the statements quoted above in a comment section of a *Federal Register*. The "comment section" is not part of the HCP Handbook. The HCP Handbook itself, however, makes it clear that it is intended as a guide.[87] It states that it provides "detailed but flexible guidelines to be used in developing HCPs."[88] According to the handbook, the flexible guidelines are necessary due to the "wide array of circumstances" that arise in conservation planning.[89] Furthermore, the Service expressly rejected making the handbook "regulatory in nature," and instead, published it as a policy.[90] In doing so, the Service affirmed that "[n]othing in this guidance is intended to supercede or alter any aspect of Federal law or regulation pertaining to the conservation of threatened or endangered species."[91]

The totality of these statements shows that the HCP Handbook was not meant to have the force of law, and merely including comments in the *Federal Register* did not make the Service legally bound to include a take limit on a permit. It is well established that population counts for Utah Prairie Dogs are generally unreliable and experience confirms that such counts at the Golf

---

[86]  Id. at 825.

[87]  HCP Handbook, at 1-1 (Docket No. 80, Ex. 1).

[88]  Id. at 1-3.

[89]  Id. at 1-1.

[90]  65 FR 35243, Issue 1 & Response 1 (Docket No. 72, Ex. 1).

[91]  Id. at 35250.

Course and Paiute lands have been unreliable. Thus, where the intent was to relocate the entire population, including a specific take limit would have added a complication and unnecessary restriction should the site population exceed the take limit. The Service did provide an estimate in the incidental take statement on the number of prairie dogs to be moved. That is all that could reasonably be required given the uncertainty of the population count and the objective to move the entire colony. While under other circumstances it may be appropriate to require a take limit on a permit, the court holds that under the circumstances of this case, the Service was not obligated to include a take amount on the permits.

## IV.    MITIGATION AND MINIMIZATION

WildEarth Guardians further contends that the HCP does not sufficiently minimize or mitigate the impact on the Utah Prairie Dogs. As stated above, the Service must find that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of [the] taking."[92] What constitutes the "maximum extent practicable" is not defined in statute.[93] The Service, however, has interpreted the statute to mean mitigation that "is rationally related to the level of take under the plan," and courts have agreed with this interpretation.[94] In conjunction with this finding, the Service also must determine that the take "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild."[95]

_____

[92]  16 U.S.C. § 1539(a)(2)(B)(ii).

[93]  Nat'l Wildlife Fed'n v. Norton, 306 F. Supp. 2d 920, 927 (E.D. Cal. 2004).

[94]  Id. at 928 (quotations and citations omitted).

[95]  16 U.S.C. § 1539(a)(2)(B)(iv).

Here, the Service reviewed Cedar City and the Paiute Tribe's proposal to translocate prairie dogs during the first two years of the permits and then do lethal trapping for the remaining years. The Service concluded that lethal trapping was not incidental to the take.[96] Consequently, Cedar City and the Paiute Tribe must translocate the prairie dogs to an approved site throughout the duration of the permit.[97]

The Service also evaluated the Golf Course habitat and has determined that it is artificial and isolated. The purpose of the ESA is to maintain the species in its native ecosystems. Preserving the prairie dog habitat at the Golf Course does not advance this objective. The Service reasonably concluded that the prairie dogs at this habitat cannot contribute to the overall recovery of the species *in the wild* because of the isolation. As a result, the Service determined the contribution of these Utah Prairie Dogs to the long-term recovery of the species is minimal.

The Service compared this factor against the proposed mitigation measure of establishing Wild Pea Hollow as a permanently protected prairie dog habitat. Wild Pea Hollow is a natural habitat that provides possible connectivity between prairie dog colonies and the potential for genetic mixing. It also fulfills two main objectives under the Recovery Plan, namely, establishing prairie dogs on public lands and restoring suitable habitat on public lands.[98] Based on these considerations, the Service concluded the HCP adequately minimized and mitigated the impact on the prairie dogs. WildEarth Guardians disagrees based on three main factors.

---

[96] AR 1397.

[97] AR 1397–98.

[98] AR 666.

A.        **Failure to Use Buried Fences**

WildEarth Guardians claims the permits should be vacated because the Service never considered any alternatives to the HCP.  In particular, WildEarth Guardians contends the Service never seriously considered using buried fences at the Golf Course habitat to confine the Utah Prairie Dogs to the "rough" areas.  Had buried fences been combined with the already existing Iron County HCP, WildEarth Guardians argues the interaction problem between humans and prairie dogs could have been mitigated.

In rejecting this alternative, the Service had to evaluate the relevant data and then "articulate[] a rational connection between the facts found and the decision made."[99]  The Administrative Record shows that the Service did consider buried fences.[100]  This alternative was rejected, however, due to the great difficulty of keeping prairie dogs confined to the roughs on the Golf Course through use of buried fences.[101]  In addition, buried fences would not have dealt with prairie dogs entering the Golf Course from another location.[102]  Moreover, under the Iron County HCP, the Golf Course was not permitted to fill in any burrow holes.  Thus, using buried fences in conjunction with the Iron County HCP would not have resolved the problems on the Golf Course. Additionally, had the "buried fence" alternative been adopted, Wild Pea Hollow would not have been

---

[99]  Citizens' Comm. to Save Our Canyons, 513 F.3d at 1176.

[100]  AR 479, 666–67, 1398, 1406–07.

[101]  AR 479, 1406–07.

[102]  Id.

put into a conservation easement.[103]  This would have resulted in the loss of 303 acres of protected

prairie dog lands.[104]  Based on these factors, the Service articulated a rational connection between

the facts found and the decision made.  The court therefore holds that rejection of this alternative was

not arbitrary or capricious.

**B.     Failure to Establish a Viable Habitat Before Translocation**

WildEarth Guardians also contends that the Service failed to establish Wild Pea Hollow as

a viable habitat before Cedar City began translocating prairie dogs to Berry Springs.  Thus, according

to WildEarth Guardians, it is mere speculation that Wild Pea Hollow will be a viable habitat and a

speculative habitat cannot mitigate the loss of the current habitats on the Golf Course and Paiute

lands.  WildEarth Guardians therefore contends that mitigation was inadequate.

When a court reviews an agency action, it generally is limited to "the administrative record

that was before the agency at the time of its decision."[105]  Post-decisional material "is irrelevant to

whether the [Service] properly fulfilled [its] obligations prior to approving a particular project."[106]

At the time the Service issued the relevant permits, Wild Pea Hollow had already been

acquired by Iron County, and the HCP required the property to be put into a conservation easement

---

[103]  AR 479.

[104]  Id.

[105]  Lewis, 998 F.2d at 882 (citation omitted); see also Fort Sumter Tours v. Babbitt, 66 F.3d 1324, 1336 (4th Cir. 1995) (stating "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." (quotations and citations omitted)).

[106]  Utah Envtl. Cong. v. Troyer, 479 F.3d 1269, 1282 (10th Cir. 2007).

to permanently protect it as a Utah Prairie Dog habitat.[107]  The land contained 19 acres of established

habitat and 198 acres of suitable habitat if it was revegetated.[108]  In November 2004, during the HCP

approval process, Cedar City reseeded about 150 acres of the protected land.[109]  The HCP and the

Implementation Agreement, which was entered into before the permits issued, placed responsibility

on Cedar City, the Paiute Tribe, and various governmental agencies to continue revegetation efforts

and monitoring.[110]  A further incentive was built into the HCP because the Paiute Tribe cannot begin

translocation efforts until Wild Pea Hollow has been successfully revegetated or at least seventy

adult prairie dogs are seen at that location.[111]  Annual counts of prairie dogs at Wild Pea Hollow

showed the population steadily increasing from 9 prairie dogs in 1998 to 57 prairie dogs in 2005.[112]

Moreover, the location of Wild Pea Hollow provides potential connectivity between prairie dog

colonies.  All of these factors demonstrated that Wild Pea Hollow provided a strong mitigation to

the loss of the artificial habitat on the Golf Course and Paiute lands.

WildEarth Guardians nevertheless contends that Wild Pea Hollow is not a viable habitat.  Its

assertion is based, in part, on the following data.  In 2007, the Wild Pea Hollow prairie dog

---

[107] AR 515, 566; see also AR 551–65.

[108] AR 436, 572–73.

[109] AR 300.

[110] AR 577–78, 580–91.

[111] AR 513, 517.

[112] AR 436.  The Supplemental Administrative Record reveals that 113 adult prairie dogs were counted in 2006.  Docket No. 55, Ex. 1, at 8.

population crashed, likely due to the plague.[113]   Additionally, despite the reseeding in November

2004, germination was still low by summer 2007 due to a prolonged drought.[114]   Even if reseeding

is eventually successful, WildEarth Guardians contends there is no guarantee it will not deteriorate

after the permits expire.   These factors prove, it argues, that Wild Pea Hollow is insufficient to

mitigate the take at the Golf Course and Paiute lands.

Notably, however, most of this data is post-decisional because the Service issued the permits

in January 2007.[115]   Moreover, the very purpose of the Wild Pea Hollow conservation easement "is

to protect and enhance forever" the Utah Prairie Dog habitat at the site.[116]   The Utah Department of

Natural Resources has oversight of the easement to ensure its purposes are carried out.[117]   Based on

the Wild Pea Hollow data available to the Service before the permits were issued and for the purpose

of the conservation easement, the court holds that the Service did not make a clear error in judgment

when it found that Wild Pea Hollow adequately mitigated the loss of the Golf Course and Paiute land

habitats.

C.      **Translocation Procedures**

WildEarth Guardians also contends that the translocation procedures are inadequate because

---

[113]  Reinitiation of Intra-Service Consultation, at 8 (Docket No. 55, Ex. 1).

[114]  Id. at 9.

[115]  The Service did reinitiate consultation in August 2008.  Based on the continuing efforts
to revegetate and increase colonization at Wild Pea Hollow, which efforts are required under the
HCP, the Service concluded that Wild Pea Hollow still offered a strong mitigation site.  Id. at 8–9,
12.

[116]  AR 551.

[117]  AR 552–53.

there is a low survival rate and the procedures are merely recommended and not required.  Again, WildEarth Guardians cites to post-decisional data to support its contention that different translocation procedures should be used.  WildEarth Guardians had an opportunity to review and comment on the application, HCP, and EA.  Had it wanted certain data from its experts included in the Administrative Record, WildEarth Guardians should have submitted it at the time it provided its other comments.

Furthermore, the record reveals the translocation procedures are mandatory rather than discretionary.[118]   As part of the Utah Prairie Dog recovery plan, an Interagency Recovery Implementation Team was formed in 1994.[119]  Representatives from Federal agencies, a state agency, and universities are part of the team.[120]  In 1997, the team proposed additional procedures to help with the recovery of Utah Prairie Dogs.[121]  When the survival rate after translocation remained low, the team recommended new procedures.  These procedures are reflected in the *Recommended Translocation Procedures for Utah Prairie Dogs* that was published in January 2006.[122]

While it is true these are the recommended procedures of the team, the Service *required* Cedar City and the Paiute Tribe to follow the recommended procedures.  The permits' Terms and

---

[118]   AR 670, 673.

[119]   AR 1249.

[120]   Id. at 1249.  The team "involves representatives of Federal agencies (Fish and Wildlife Service, Bureau of Land Management, Forest Service, Nation Park Service (Bryce Canyon) and USDA APHIS Wildlife Services), State agencies (Utah Division of Wildlife Resources), and universities (Utah State University, Brigham Young University, Southern Utah University)."  Id.

[121]   AR 1248–49.

[122]   AR 532.

Conditions state: "All trapping and translocation of Utah prairie dogs by [the permittees] *will follow* all procedures outlined in the Recommended Translocation Procedures approved by the Utah Prairie Dog Recovery Team (January 2006) *or the most current approved procedures*."[123]  Thus, not only are Cedar City and the Paiute Tribe required to follow the translocation procedures, if the procedures are ever updated during the life of the permit, the permittees must follow the new procedures.  By making this a requirement of the permits, the Service has ensured that the permittees are using the best translocation procedures approved by the Interagency Recovery Implementation Team.  The court therefore concludes that the Service's decision was not arbitrary and capricious when it issued the permits.

## V.     MOTIONS TO STRIKE

### A.     Motion to Strike Post-Decisional Data Cited by WildEarth Guardians

WildEarth Guardians filed a motion for preliminary injunction in April 2008.  The Service moved to strike portions of the motion because it included exhibits that are not part of the Administrative Record.  The court denied both motions in June 2008, but said that the Service could renew its motion to strike when the case was addressed on the merits.[124]  The Service renewed that motion when it filed its opposition brief.[125]

The court did not rely upon the post-decisional data cited by WildEarth Guardians due to the well-developed Administrative Record and because WildEarth Guardians did not demonstrate a

---

[123]  AR 670, 673.

[124]  Order (June 25, 2008) (Docket No. 43).

[125]  Defendant's Opposition Brief on the Merits, at 19 (Docket No. 67).

viable reason why post-decisional data should be included. Because the court did not rely on such data, it hereby grants the Service's renewed motion to strike post-decisional data.

**B.    Motion to Strike Data Cited by Cedar City**

Cedar City filed an *amicus curiae* brief in support of the Service's decision. The brief included information about the health risks to humans that prairie dogs pose due to the plague. WildEarth Guardians moved to strike the information because it was not part of the Administrative Record. Again, however, the court did not rely upon the information cited by Cedar City to reach its conclusions above. Even if it were to rely upon the information, it would not alter the court's decision. The issue, therefore, is moot.

## <u>CONCLUSION</u>

Because WildEarth Guardians did not address claims 3, 4, 6, 7, and 8 in its opening brief, those claims are hereby DISMISSED WITH PREJUDICE.[126]

With respect to the remaining claims, the court concludes that the Service was not required to include a numeric take limit on the incidental take permits. The court further concludes that the Service's finding that the HCP sufficiently minimized and mitigated the impact of the take was not arbitrary and capricious. Accordingly, the court affirms the Service's decision to issue incidental take permits to Cedar City and the Paiute Tribe, and hereby DISMISSES WITH PREJUDICE the First Amended Complaint.[127]

---

[126] Docket No. 7.

[127] Docket No. 7.

The court GRANTS the Service's renewed Motion to Strike,[128] and DENIES AS MOOT WildEarth Guardian's Motion to Strike[129] for the reasons stated above.

DATED this 22nd day of April, 2009.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[128]  Docket No. 32.

[129]  Docket No. 83.